Filed 7/24/17

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

        Plaintiff and Respondent,

        v.

ALLEN DIMEN DeLEON,

        Defendant and Appellant.

S230906

Ct.App. 1/3 A140050

Solano County
Super. Ct. No. FCR302185

Under *Morrissey v. Brewer* (1972) 408 U.S. 471 (*Morrissey*), parolees facing revocation are constitutionally entitled to certain due process protections. These include the right to a prompt preliminary hearing after arrest to determine whether there is probable cause to believe a parole violation has occurred. (*Id*. at pp. 485–487.) The Criminal Justice Realignment Act of 2011 (the Realignment Act) transferred jurisdiction over most parole revocation hearings from the Board of Parole Hearings (BPH) to the superior courts. The question here is whether this enactment makes a preliminary hearing unnecessary. The Court of Appeal held that it did. We reject this conclusion, and hold that the *Morrissey* preliminary hearing requirement applies to parole revocation proceedings conducted in superior court.

## I. BACKGROUND

Defendant Allen Dimen DeLeon was paroled in January 2012 after serving a prison sentence for committing a lewd act on a minor and failing to register as a

1

sex offender.  On August 23, 2013, he was arrested for possessing pornographic material in violation of a condition of his parole.

On August 26, 2013, a supervising parole agent with the Department of Corrections and Rehabilitation found probable cause to revoke DeLeon's parole and gave him written notice of the alleged parole violation.  A petition to revoke was filed in the superior court on September 4, 2013.  On September 6, a judicial officer conducted an ex parte review, found probable cause, and summarily revoked DeLeon's parole.  A hearing was set for September 11, 19 days after DeLeon's arrest.

On the scheduled hearing date, DeLeon appeared with counsel and moved to dismiss the petition because he had not received a preliminary hearing within 15 days of his arrest, as specified in Penal Code[1] section 3044.  Over his objection, the court continued the motion and set a briefing schedule.  On September 25, 2013, the court denied the motion to dismiss.  It found that the ex parte determination of probable cause, made 14 days after DeLeon's arrest, satisfied due process.

On October 3, 2013, 41 days after DeLeon's arrest, the court held a revocation hearing, found him in violation, sentenced him to serve 180 days in custody, and reinstated parole.

## II.  DISCUSSION

A. *Mootness*

" '[W]hen, pending an appeal from the judgment of a lower court, and without any fault of the [opposing party], an event occurs which renders it impossible for this court, if it should decide the case in favor of [defendant], to

---

[1]     Further undesignated statutory references are to the Penal Code.

2

grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal' " as moot.  (*Paul v. Milk Depots, Inc*. (1964) 62 Cal.2d 129, 132, quoting *Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863.)

DeLeon has completed his county jail term.  Counsel has informed us that parole supervision ended on June 27, 2014, one day after the Court of Appeal briefing was complete, and 16 months before that court issued its opinion.  DeLeon's appeal is technically moot because a reviewing court's resolution of the issues could offer no relief regarding the time he spent in custody or the parole term that has already terminated.  (See *People v. Morales* (2016) 63 Cal.4th 399, 409 (*Morales*) [order discharging defendant from parole rendered appeal moot].)

DeLeon argues that his appeal is not moot because he faces disadvantageous collateral consequences from the fact that he was found in violation of parole.  (See *Carafas v. LaVallee* (1968) 391 U.S. 234, 237 [discussing collateral consequences of a criminal conviction]; *People v. DeLong* (2002) 101 Cal.App.4th 482, 487–492 [collecting cases].)  He points out that unsatisfactory performance on parole is a criterion affecting eligibility for probation and mandatory supervision (Cal. Rules of Court, rules 4.414(b)(2), 4.415(c)(5)), and is an aggravating circumstance in selecting a term of imprisonment (*id*., rule 4.421(b)(5)).

The Supreme Court rejected a similar claim in *Spencer v. Kemna* (1998) 523 U.S. 1 (*Spencer*).  There the court considered whether the defendant's appeal from a parole revocation was mooted by the fact that he had completed the entire term of imprisonment underlying the revocation.  (*Id*. at p. 3.)  Interpreting the case-or-controversy requirement of article III, section 2 of the federal Constitution (*id*. at p. 7), the court held that a violation of parole does not result in civil disabilities resembling those that stem from a criminal conviction (*id*. at p. 12,

3

citing *Lane v. Williams* (1982) 455 U.S. 624, 632). The court further rejected the argument that the defendant faced "collateral consequences" from the *potential* use of the parole violation in a future proceeding. (*Spencer*, at p. 12.) This possibility did not show an injury in fact. First, it was contingent upon the defendant again violating the law, a circumstance that was wholly within his control. Second, a prior parole violation did not mandate a particular consequence, but was simply one factor among many that could be considered in a discretionary decision by the parole authority. (*Id*. at p. 13.)

By contrast, two Court of Appeal opinions lend support to DeLeon's position. *People v. Gonzalez* (2017) 7 Cal.App.5th 370 held that the defendant's appeal from an order revoking postrelease community supervision was not made moot by his discharge from supervision because his unsatisfactory performance could have disadvantageous collateral consequences should he be convicted of a new offense. (*Id*. at pp. 380–381 [citing Cal. Rules of Court, rules 4.414(b)(2), 4.421(b)(5)].) *Gonzalez* did not discuss the high court's contrary holding in *Spencer*, *supra*, 523 U.S. 1. *People v. Osorio* (2015) 235 Cal.App.4th 1408 did acknowledge *Spencer*, but observed that it could not say "with reasonable certainty" that the defendant's appeal was moot given the possibility that the parole revocation might be used against him in a future criminal sentencing proceeding, employment determination, or child custody matter. (*Id*. at p. 1412.)

*Spencer*'s analysis is persuasive, and we adopt it. The trial court's finding that DeLeon violated his parole does not involve the same collateral consequences that attach to a criminal conviction. Future consequences will not arise unless there is additional criminal conduct. Even then, his parole violation is just one of many factors a court may consider in deciding whether to grant probation, or what sentence to impose. Under these circumstances, DeLeon's parole violation does not constitute a disadvantageous collateral consequence for purposes of assessing

4

mootness.[2] We disapprove contrary language in *People v. Gonzalez*, *supra*, 7 Cal.App.5th at pages 380–381, and *People v. Osorio*, *supra*, 235 Cal.App.4th at page 1412.

Even though DeLeon's appeal is moot, we exercise our discretion to decide what procedure should govern parole revocation proceedings under the Realignment Act. The issue "is likely to recur, might otherwise evade appellate review, and is of continuing public interest." (*Morales*, *supra*, 63 Cal.4th at p. 409; accord, *Williams v. Superior Court* (2014) 230 Cal.App.4th 636, 654 (*Williams*); cf. *People v. Moran* (2016) 1 Cal.5th 398, 408, fn. 8; *People v. Hronchak* (2016) 2 Cal.App.5th 884, 889.) Accordingly, we resolve the legal question that prompted our grant of review.

B. *Overview of the Realignment Act*

Historically, BPH was responsible for conducting parole revocation hearings. (*In re Prather* (2010) 50 Cal.4th 238, 249, 254 (*Prather*).) Under the Realignment Act, jurisdiction over most petitions to revoke parole shifted to the superior courts. (§ 3000.08, subds. (a), (f), added by Stats. 2011, ch. 39, § 38 [Assem. Bill No. 117]; amended by Stats. 2012, ch. 43, § 35 [Sen. Bill No. 1023].) In 2012 the Legislature amended section 1203.2 to incorporate parole into the statutes governing revocation of probation, mandatory supervision, and postrelease community supervision. (§ 1203.2, subds. (a), (b)(1), (f)(3)(E), as amended by Stats. 2012, ch. 43, § 30 [Sen. Bill No. 1023].) Its stated intent was "to provide for a uniform supervision revocation process for petitions to revoke probation,

---

[2]     We do not foreclose the possibility that, under other circumstances, a defendant could demonstrate sufficiently concrete consequences to avoid a finding of mootness, even if the term of imprisonment has already concluded. Instead, we hold that the consequences DeLeon has identified here are simply too speculative to support the conclusion that a legally sufficient controversy exists.

5

mandatory supervision, postrelease community supervision, and parole." (Stats. 2012, ch. 43, § 2, subd. (a).)

Together, sections 1203.2 and 3000.08 establish a statutory framework for parole revocation. A parolee may be arrested, with or without a warrant, based on probable cause to believe that a parole violation has occurred. (§§ 1203.2, subd. (a), 3000.08, subd. (c).) The supervising parole agency determines if there is good cause to believe the subject has violated parole, and may impose intermediate sanctions, including "flash incarceration" for up to 10 days. (§ 3000.08, subds. (d), (e).) If intermediate sanctions are not appropriate, the parole agency must petition the superior court to revoke parole, and provide notice to the parolee. (§§ 1203.2, subd. (b), 3000.08, subd. (f).) Jurisdiction lies "in the county in which the parolee is released, resides, or in which an alleged violation of supervision has occurred." (§ 3000.08, subd. (a); see also § 1203.2, subd. (b)(1).) The court may modify or revoke parole if the interests of justice so require. (§ 1203.2, subd. (b); § 3000.08, subd. (f).) In so doing, the court may order the parolee to serve up to 180 days in jail. (§ 3000.08, subds. (f)(1), (2), (g).)

Section 1203.2 does not expressly provide for a preliminary hearing. DeLeon argues that another statutory provision, section 3044, and the due process clause of the federal Constitution, require one. The Court of Appeal rejected these arguments. It held that section 3044 is directed to BPH, not the superior courts. It further held that, under the Realignment Act, "superior courts are not required to conduct preliminary probable cause hearings as specified in [*Morrissey*, *supra*, 408 U.S. 471] before revoking parole, and that a timely single hearing procedure can suffice." The court noted that a judicial probable cause determination was made within 14 days of DeLeon's arrest, he appeared before the court on the 20th day of his detention, and he received other procedural protections. In light of

6

these circumstances, "the hearing conducted within 45 days of his arrest afforded him constitutionally adequate process."

C.  *Section 3044*

We first address DeLeon's claim of statutory error.  Section 3044 sets forth several procedural rights to be afforded parolees in revocation hearings conducted by BPH.  As relevant here, a parolee is entitled to a probable cause hearing within 15 days after an arrest for a parole violation.  (§ 3044, subd. (a)(1).)  DeLeon contends that this statute applies to parole revocation proceedings conducted in superior court.  His interpretation of the statute is unpersuasive.

Section 3044 was enacted by the voters in 2008 as part of Proposition 9, commonly known as "The Victims' Bill of Rights Act of 2008:  Marsy's Law." (*In re Vicks* (2013) 56 Cal.4th 274, 278; Prop. 9, § 5.3, as approved by voters, Gen. Elec. (Nov. 4, 2008) eff. Nov. 5, 2008 (Marsy's Law).)  At that time, BPH was responsible for conducting parole revocation hearings.  (*Prather*, *supra*, 50 Cal.4th at p. 254.)  Section 3044 is directed to the "Board of Parole Hearings or its successor in interest."  (§ 3044, subd. (a).)  It provides that BPH "shall be the state's parole authority," "shall be responsible for protecting victims' rights in the parole process," and shall adhere to the procedures it provides.  (*Ibid*.) Subdivision (b) emphasizes that "[t]he board is entrusted with the safety of victims and the public and shall make its determination fairly, independently, and without bias and shall not be influenced by or weigh the state cost or burden associated with just decisions.  The board must accordingly enjoy sufficient autonomy to conduct unbiased hearings, and maintain an independent legal and administrative staff.  The board shall report to the Governor."  (§ 3044, subd. (b).)

The fact that the statute is bookended by directives to BPH provides context for its procedural provisions.  " '[W]e look to "the entire substance of the statute

7

. . . in order to determine the scope and purpose of the provision . . . . [Citation.]" [Citation.] That is, we construe the words in question " 'in context, keeping in mind the nature and obvious purpose of the statute . . . .' [Citation.]" [Citation.] We must harmonize "the various parts of a statutory enactment . . . by considering the particular clause or section in the context of the statutory framework as a whole." ' " (*People v. Acosta* (2002) 29 Cal.4th 105, 112.) "[O]ur interpretation of a ballot initiative is governed by the same rules that apply in construing a statute enacted by the Legislature." (*People v. Park* (2013) 56 Cal.4th 782, 796.) The statute as a whole makes clear that its procedures were drafted to apply to BPH when acting as the arbiter of parole revocation hearings.

Even were we to view the statutory language as ambiguous, the ballot materials accompanying Marsy's Law provide further support for this conclusion. (See *Morales*, *supra*, 63 Cal.4th at pp. 406–407 [looking to the Legis. Analyst's analysis for evidence of the voters' likely understanding of a proposition's meaning].) The analysis told voters that "[t]he Board of Parole Hearings conducts two different types of proceedings relating to parole," release and revocation. (Voter Information Guide, Gen. Elec. (Nov. 4, 2008) analysis of Prop. 9 by the Legis. Analyst, p. 59 (2008 Voter Information Guide).) It explained that "[t]his measure changes the board's parole revocation procedures for offenders after they have been paroled from prison" and mentioned a federal court order directed to the Department of Corrections and Rehabilitation. (*Id*. at p. 60.) There is no reason to believe that the voters contemplated adopting a set of procedures for the superior courts, which then played no role in the revocation process.

The voters did make section 3044 applicable to BPH or "its successor in interest." (§ 3044, subd. (a).) However, the superior court, an arm of the judicial branch, is not a successor in interest to BPH, an agency of the executive. (See §§ 3044, subd. (b), 5075.) To conclude otherwise would ignore the distinct roles of

8

these two branches of government and create anomalies in other portions of the statute.  Subdivision (a) refers to BPH "or its successor in interest" as the "state's parole authority."  (§ 3044, subd. (a).)  While the courts handle most revocation hearings postrealignment, they do not act as the "state's parole authority" in other respects, including determining parole suitability and setting parole release dates.  (See §§ 3040, 3041, 5075.1.)  Nor do the superior courts "report to the Governor" as required under section 3044, subdivision (b).  A more reasonable reading of the "successor in interest" provision is that it applies in the event that another administrative agency assumes responsibility for overseeing the parole process as the "state's parole authority."  (§ 3044, subd. (a).)

We also find no evidence that the Legislature intended to incorporate section 3044's procedures into the Realignment Act.  The act inserted parole revocation provisions into section 1203.2, which falls under part 2, title 8, of the Penal Code (§ 1191 et seq.), governing "Judgment and Execution" in the superior court.  It did not cross-reference the provisions of section 3044.  Rather, the Legislature stated its intent "that these amendments simultaneously incorporate the procedural due process protections held to apply to probation revocation procedures under Morrissey v. Brewer (1972) 408 U.S. 471, and People v. Vickers (1972) 8 Cal.3d 451, and their progeny."  (Stats. 2012, ch. 43, § 2, subd. (b).)[3]

The Legislature's reference to *Morrissey*, and its omission of any reference to section 3044, is significant in light of the protracted and ongoing litigation over parole revocation proceedings, including section 3044.  In 1994, California parolees filed a class action lawsuit in federal district court challenging various aspects of the state's unitary parole revocation process.  (See *Valdivia v. Brown*

---

[3]     Those procedures are discussed in further detail below.

(E.D.Cal. 2013) 956 F.Supp.2d 1125, 1126 [summarizing procedural history].)
That system was found unconstitutional (*Valdivia v. Davis* (E.D.Cal. 2002) 206
F.Supp.2d 1068, 1075–1078), and the parties ultimately filed a stipulated order for
injunctive relief, which the court entered in 2004. (See *Valdivia v. Brown*, *supra*,
956 F.Supp.2d at pp. 1128–1129 [summarizing injunction].) Marsy's Law took
aim at this injunction by adopting minimum procedural protections to be afforded
parolees under section 3044. (2008 Voter Information Guide, *supra*, analysis of
Prop. 9 by the Legis. Analyst, p. 60 [discussing *Valdivia* litigation].) Section
3044, in turn, was challenged in federal court. The district court issued an order in
March 2009 invalidating four provisions of the statute because they conflicted
with the 2004 injunction. (*Valdivia v. Schwarzenegger* (E.D.Cal. 2009) 603
F.Supp.2d 1275, 1282–1283.) The Ninth Circuit reversed and remanded with
directions that the district court review the statute against constitutional standards.
(*Valdivia v. Schwarzenegger* (9th Cir. 2010) 599 F.3d 984, 994–995.) In January
2012, the district court found six provisions of section 3044, including subdivision
(a)(1), unconstitutional. Concluding these provisions were not severable from the
remainder of the statute, it struck section 3044 down in its entirety. The district
court accordingly granted the plaintiffs' motion to reinstate the injunction, albeit
with one modification. (*Valdivia v. Brown* (E.D.Cal. Jan. 24, 2012, No. CIV. S-
94-671 LKK/GGH) 2012 WL 219342 at pp. *4–*13.) We presume that the
Legislature was aware of this ongoing litigation when it amended section 1203.2
on June 27, 2012. (*People v. Scott* (2014) 58 Cal.4th 1415, 1424; see fn. 4, *post*.)
The Legislature's reference to *Morrissey* as the constitutional baseline, rather than
section 3044 (Stats. 2012, ch. 43, § 2, subd. (b)), is consistent with this
presumption, and it suggests an intent to avoid any constitutional infirmity in the
statute's provisions. Notably, in 2013 the district court held that California's

10

passage of the Realignment Act had rendered the *Valdivia* legislation moot. (*Valdivia v. Brown*, *supra*, 956 F.Supp.2d at pp. 1135–1137.)

In arguing that section 3044's provisions apply to proceedings in superior court, DeLeon reasons that section 3044 was enacted by a voter initiative and was not properly amended according to the initiative's terms. *Williams*, *supra*, 230 Cal.App.4th 636, concluded that, because the requisite voting margin was not achieved in amending section 1203.2 as part of the Realignment Act, the statutes must be harmonized by applying the procedural requirements of section 3044 to the provisions of section 1203.2. (*Williams*, at pp. 658–659.)[4] We reject this conclusion.

Under article II, section 10, subdivision (c) of our Constitution, "[t]he Legislature . . . may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors *unless* the initiative statute permits amendment or repeal without their approval." (Italics added.) Marsy's Law allows amendment by the Legislature "by a statute passed in each house by roll-call vote entered in the journal, three-fourths of the membership of each house concurring, or by a statute that becomes effective only when approved by the

---

[4]     Senate Bill No. 1023 (2011–2012 Reg. Sess.) amended section 1203.2 to incorporate parole into the statutes governing revocation of probation, mandatory supervision, and postrelease community supervision. (Stats. 2012, ch. 43, § 30.) It passed in the Assembly by a vote of 49 to 29 with two members abstaining and in the Senate by a vote of 22 to 15 with three members abstaining. (4 Assem. J. (2011–2012 Reg. Sess.) p. 5478; Sen. Daily J. (June 27, 2012) p. 4152.) Assembly Bill No. 117 (2011–2012 Reg. Sess.) added section 3000.08, which authorized the superior courts to exercise jurisdiction over most parole revocation proceedings. (Stats. 2011, ch. 39, § 38.) It passed in the Assembly by a vote of 51 to 28 with one member abstaining and in the Senate by a vote of 24 to 14 with two members abstaining. (2 Assem. J. (2011–2012 Reg. Sess.) pp. 2096–2097; Sen. Daily J. (June 28, 2011) p. 1614.)

voters." (2008 Voter Information Guide, *supra*, text of Prop. 9, § 9 at p. 132.) Additionally, it permits the Legislature to "amend the statutory provision of this act to expand the scope of their application, to recognize additional rights of victims of crime, or to further the rights of victims of crime by a statute passed by a majority vote of the membership of each house." (*Ibid*.)

"[F]or purposes of article II, section 10, subdivision (c), an amendment includes a legislative act that changes an existing initiative statute by taking away from it." (*People v. Kelly* (2010) 47 Cal.4th 1008, 1026–1027.) Assuming the Realignment Act effectively amended section 3044 by adopting parole revocation procedures for the superior courts, the amendment furthers the purposes of Marsy's Law, and was therefore permissible by majority vote.

We "start[] with the presumption that the Legislature acted within its authority" and uphold the validity of the legislative amendment "if, by any reasonable construction, it can be said that the statute furthers the purposes" of the initiative. (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1256.) Marsy's Law sought to curtail the procedural rights of parolees to spare crime victims and their families from burdensome and unnecessary proceedings.[5] Section 3044, like the rest of Marsy's Law, evinces this intent. Subdivision (a) of that statute is phrased in terms of *limiting* a parolee's procedural rights: "to

[5] One of the findings and declarations of Marsy's Law was that "[e]ach year hundreds of convicted murderers sentenced to serve life in prison seek release on parole from our state prisons. California's 'release from prison parole procedures' torture the families of murdered victims and waste millions of dollars each year. In California convicted murderers are appointed attorneys paid by the tax dollars of its citizens, and these convicted murderers are often given parole hearings every year. The families of murdered victims are never able to escape the seemingly unending torture and fear that the murderer of their loved one will be once again free to murder." (2008 Voter Information Guide, *supra*, text of Prop. 9, § 2, at pp. 128–129.)

protect a victim from harassment and abuse during the parole process, *no person paroled from a California correctional facility following incarceration . . . shall*, in the event his or her parole is revoked, *be entitled to procedural rights other than the following . . . .*" (§ 3044, subd. (a), italics added.)  Several of the enumerated procedural rights are less protective of parolees than those previously adopted by the federal district court in the 2004 stipulated order for injunctive relief.  (See 2008 Voter Information Guide, *supra*, analysis of Prop. 9 by the Legis. Analyst, at p. 60; *Valdivia v. Brown*, *supra*, 956 F.Supp.2d at pp. 1128–1129.)  Of course, no statute, whether enacted by the Legislature or by voter initiative, can circumvent minimum constitutional protections.  The Legislature's decision to set parolees' rights at *Morrissey*'s constitutional baseline in section 1203.2 proceedings furthers the purposes of Marsy's Law.

Moreover, we may consider later statutory amendments in deciding the validity of an implied amendment.  (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 390–393 (*Ewoldt*).)  Here, two statutory amendments are significant.  The first was part of Proposition 47, the Safe Neighborhoods and Schools Act, enacted by the voters on November 4, 2014.  (Prop. 47, as approved by voters, Gen. Elec. (Nov. 4, 2014) eff. Nov. 5, 2014.)  That proposition added section 1170.18.  It allows someone serving a sentence for a crime that the proposition reduced to a misdemeanor to petition for recall of the sentence.  (§ 1170.18, subd. (a); Voter Information Guide, Gen. Elec. (Nov. 4, 2014) text of Prop. 47, § 14, pp. 73–74.)  As relevant here, section 1170.18, subdivision (d) provides:  "A person who is resentenced pursuant to subdivision (b) shall be given credit for time served and shall be subject to parole for one year following completion of his or her sentence, unless the court, in its discretion, as part of its resentencing order, releases the person from parole.  *Such person is subject to Section 3000.08* parole supervision by the Department of Corrections and Rehabilitation *and the jurisdiction of the*

13

*court in the county in which the parolee is released or resides, or in which an alleged violation of supervision has occurred, for the purpose of hearing petitions to revoke parole and impose a term of custody.*" (Italics added.) The voters, by initiative, thus approved section 3000.08's provision authorizing superior court jurisdiction over most parole revocation proceedings.[6]

The second relevant action, Senate Bill No. 517 (2015–2016 Reg. Sess.), *amended and reenacted* sections 1203.2 and 3000.08 in 2015.[7] (Stats. 2015, ch. 61, §§ 1, 2.) That bill was passed with the required three-fourths' vote in each house.[8] It added a substantive provision to each statute authorizing the court to order the release of a supervised person, "who has been arrested under this section," from custody "under any terms and conditions the court deems appropriate." (Stats. 2015, ch. 61, § 1 [amending § 1203.2]; see *id.*, § 2 [amending § 3000.08].) As *Ewoldt* explained, under section 9 of article IV of the California Constitution, " '[a] section of a statute may not be amended unless the section is re-enacted as amended.' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 391.) The Legislature did so. The amendments cannot be dismissed as merely technical. They could have no practical effect without reaffirming the Legislature's earlier enactments

---

**6** See *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 249–251 (Cal. Const., art. 11, § 10, generally allows voters to amend one initiative with another passed by majority vote); *Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1486 (amendments that conflict with the subject matter of an initiative measure may be accomplished by popular vote).

**7** As noted, these sections contain the provisions that authorize superior courts to conduct parole revocation hearings in most cases. (§§ 1203.2, subds. (a), (b), 3000.08, subds. (a), (f).)

**8** Senate Daily Journal (April 20, 2015) page 668 (passed by a vote of 34 to one with five members abstaining); Assembly Daily Journal (June 25, 2015) page 2147 (passed by a vote of 76 to zero with four members abstaining).

authorizing the superior courts to exercise jurisdiction over parole revocation proceedings.  (See *id*. at p. 392.)  To the extent it is inconsistent with our ruling here, *Williams*, *supra*, 230 Cal.App.4th at pages 657–659, is disapproved.

> D.  *Procedural Due Process*

We now consider whether DeLeon was denied his right to due process under the federal Constitution.  (U.S. Const., 14th Amend.)

Over four decades ago, *Morrissey*, *supra*, 408 U.S. 471, established the minimum due process protections for parolees facing revocation.  There, two parolees complained that their parole had been revoked based on a written report but without a hearing.  (*Id*. at p. 473.)  Holding that due process required a hearing, the court observed that "[i]mplicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole."  (*Id*. at p. 479; see also *id*. at p. 482.)  At the same time, however, the court emphasized that "revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations."  (*Id*. at p. 480.)

The court identified "two important stages" of the process.  (*Morrissey*, *supra*, 408 U.S. at p. 485.)  First, "some minimal inquiry [must] be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available. [Citation.]  Such an inquiry should be seen as in the nature of a 'preliminary hearing' to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions."  (*Ibid*.)  The determination must be made by someone uninvolved in the case.  (*Id*. at pp. 485–486.)  The procedure is informal.

15

(*Id*. at pp. 484–485.)  It requires notice to the parolee and a chance to appear and speak on his own behalf.  (*Id*. at pp. 486–487.)  "[H]e may bring letters, documents, or individuals who can give relevant information to the hearing officer."  (*Id*. at p. 487.)  At the parolee's request, witnesses to the parole violation must generally be available for questioning.  (*Ibid*.)[9]  The officer then decides whether probable cause supports continued incarceration pending a final revocation hearing.  (*Morrissey*, at p. 487.)  The officer must prepare "a summary . . . of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given" at the hearing, and shall " 'state the reasons for his determination and indicate the evidence he relied on . . . .' "  (*Ibid*.) However, " 'formal findings of fact and conclusions of law' " are not required. (*Ibid*.)

Second, the parolee must have an opportunity for a final hearing to determine if parole should be revoked.  The minimum due process requirements for this hearing are:  (1) written notice of the alleged parole violations; (2) disclosure of the evidence against the parolee; (3) an opportunity for the parolee "to be heard in person and to present witnesses and documentary evidence"; (4) "the right to confront and cross-examine adverse witnesses," unless good cause exists to deny confrontation; (5) a " 'neutral and detached' hearing body"; and (6) a written decision regarding the evidence and the reasons for revoking parole.  (*Morrissey*, *supra*, 408 U.S. at p. 489.)

*In re La Croix* (1974) 12 Cal.3d 146 (*La Croix*) recognized *Morrissey*'s application to California parolees, including the first-stage preliminary hearing: "It is thus clear that in all instances of alleged parole violations within this state a

---

[9]     The hearing officer may decline to allow "confrontation and cross-examination" of a confidential informant.  (*Morrissey*, *supra*, 408 U.S. at p. 487.)

16

parolee who has not waived his right is entitled to a prerevocation hearing as mandated by *Morrissey*" (*La Croix*, at p. 152), if the parolee is in custody for the parole violation (*id*. at p. 152, fn. 2). For over 40 years, incarcerated California parolees have been entitled to such a hearing. The question is whether the changes made to the parole revocation process by the Realignment Act eliminated this requirement. We conclude to the contrary.

Although section 1203.2 does not expressly provide for a preliminary hearing, that right is firmly established in constitutional precedent. (*Morrissey, supra,* 408 U.S. at pp. 485–487; *La Croix, supra,* 12 Cal.3d at p. 152.) In amending the statutes, the Legislature stated its intent "that these amendments simultaneously incorporate the procedural due process protections held to apply to probation revocation procedures under Morrissey v. Brewer (1972) 408 U.S. 471, and People v. Vickers (1972) 8 Cal.3d 451, and their progeny."[10] (Stats. 2012, ch. 43, § 2, subd. (b).)

The Attorney General properly concedes that parolees who face revocation under section 1203.2 are entitled to a preliminary hearing, and that the less formal procedures employed here did not comply with *Morrissey*'s due process requirements. *Morrissey* requires that the parolee be given notice of the preliminary hearing and an opportunity to appear, be heard, present documents and witnesses, and question adverse witnesses, absent good cause to deny cross-examination. (*Morrissey*, *supra*, 408 U.S. at pp. 486–487.) Here, two initial probable cause determinations were made: one by the parole agency three days after DeLeon's arrest, and a second by the court 14 days after the arrest. However, in neither instance was DeLeon allowed to appear, be heard, present evidence, or

---

[10]*People v. Vickers*, *supra*, 8 Cal.3d 451 (*Vickers*), a probation revocation case, is discussed in further detail below.

17

question his parole agent who reported the violation. These procedures did not satisfy *Morrissey*. (*Id.* at p. 487.)

In reaching a contrary conclusion, the Court of Appeal looked to *People v. Coleman* (1975) 13 Cal.3d 867 (*Coleman*), a probation revocation case. It reasoned that, under the Realignment Act, both parole and probation revocations are judicial proceedings "and as recognized in *Coleman*, cases such as *Morrissey* stating the due process requirements for revocation of parole by executive branch agencies do not clearly mandate the process that must be employed by the courts." Applying the three-factor test from *Mathews v. Eldridge* (1976) 424 U.S. 319,[11] the appellate court observed that a parolee has only "conditional liberty," and that "[t]he prompt probable cause review of the charges and the parole violation report by a judicial officer as specified in section 1203.2, subdivisions (a) and (b)(2) guards against the risk of an erroneous deprivation of liberty pending a full hearing in parole revocation cases." The court concluded that a probable cause hearing "would further burden our overworked and under-resourced superior courts while adding little to the fair determination of revocation proceedings." Amicus curiae District Attorney of Los Angeles County supports this position.

The Court of Appeal's conclusion that superior court revocation proceedings are not subject to *Morrissey*'s procedural due process requirements falters. *Vickers*, *supra*, 8 Cal.3d at page 458, found *Morrissey* applicable to probation revocation proceedings, which have long been conducted in superior court under section 1203.2. It found no principled distinction between revocation

_____

[11]     That test considers (1) the private interest affected by the official action; (2) the risk of error under the procedures employed, as well as the likely value of additional or substitute safeguards; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens" that additional procedures may impose. (*Mathews v. Eldridge*, *supra*, 424 U.S. at p. 335.)

18

of parole and of probation "insofar as the demands of due process are concerned." (*Vickers*, at p. 458.) "Certainly the nature of a probationer's interest in his liberty . . . is at least as great as that of a parolee and is entitled to at least the same due process safeguards before it is terminated. *Morrissey* is thus equally applicable in the case of a revocation of probation insofar as it assures that revocation can be had only with due process protections." (*Ibid*.) *Vickers* found former section 1203.2 deficient in part because it made "no provision for a preliminary determination of probable cause to believe that a violation of probation has occurred in order to warrant the detention of a probationer until a more formal hearing is had." (*Vickers*, at p. 458.) "The statutory provision . . . fails to meet several of the mandatory requirements of due process as set out in *Morrissey* and as now held by us to be applicable in probation revocation proceedings." (*Id*. at p. 459.)

The high court confirmed *Vickers*'s conclusion a year later in *Gagnon v. Scarpelli* (1973) 411 U.S. 778: "Petitioner does not contend that there is any difference relevant to the guarantee of due process between the revocation of parole and the revocation of probation, nor do we perceive one. Probation revocation, like parole revocation, is not a stage of a criminal prosecution, but does result in a loss of liberty. Accordingly, we hold that a probationer, like a parolee, is entitled to a preliminary and a final revocation hearing, under the conditions specified in *Morrissey v. Brewer*, *supra*." (*Id*. at p. 782, fns. omitted.) Far from authorizing fewer procedural protections, these authorities support the conclusion that *Morrissey*'s preliminary hearing requirement applies to *both* parole and probation revocation proceedings under section 1203.2. (See *People v. Woodall* (2013) 216 Cal.App.4th 1221, 1238 [given "well-established case authority" the court "construe[s] section 1203.2 to impliedly require a probable

19

cause hearing if there is any significant delay between the probationer's arrest and a final revocation hearing"].)

The Court of Appeal also looked to *Gerstein v. Pugh* (1975) 420 U.S. 103 (*Gerstein*) to conclude that an ex parte, nonadversarial determination of probable cause by a magistrate suffices to detain the parolee until the final revocation hearing. That case is inapposite. *Gerstein* held that the Fourth Amendment's protection against unlawful seizures entitles persons arrested on suspicion of criminal activity to a judicial determination of probable cause, either before or promptly after arrest, as a prerequisite to continued detention. (*Gerstein*, at pp. 111–114, 125; see also *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56 ["a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of *Gerstein*"].) For purposes of that hearing, adversary safeguards such as the right to counsel, confrontation, cross-examination, and compulsory process for witnesses "are not essential . . . . The sole issue is whether there is probable cause for detaining the arrested person pending further proceedings. This issue can be determined reliably without an adversary hearing. The standard is the same as that for arrest. That standard—probable cause to believe the suspect has committed a crime—traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof." (*Gerstein*, at p. 120, fn. omitted.)

*Gerstein* addressed the Fourth Amendment's application to an early stage of new criminal proceedings following arrest.[12] *Morrissey*, by contrast,

---

[12]  We note that a defendant who is accused of a felony and who does not waive time is entitled to a preliminary hearing within 10 court days of arraignment or plea as a matter of statute. (§ 859b.)

20

envisioned a different set of procedures for parolees facing revocation, as a component of due process. (*Morrissey*, *supra*, 408 U.S. at pp. 486–487.) *Morrissey*'s citation to *Goldberg v. Kelly* (1970) 397 U.S. 254, 267–271, along with its description of the procedures due, made clear that the parolee was not merely entitled to an ex parte determination of probable cause, but to an opportunity to be heard and to defend at an early stage. (*Morrissey*, at p. 487; accord, *Valdivia v. Davis*, *supra*, 206 F.Supp.2d at p. 1075.) *Gerstein* reaffirmed the justifications for *Morrissey*'s holding, even as it declined to extend it to the limited probable cause determination required by the Fourth Amendment. (*Gerstein*, *supra*, 420 U.S. at pp. 121–122, fn. 22.) Nothing in *Gerstein* casts doubt on *Morrissey*'s preliminary hearing procedure as applied to parolees.

We therefore reject the Court of Appeal's conclusion that *Morrissey* is inapplicable because the parole revocation process is conducted by the superior court, rather than the parole board. Accordingly, we have no need to resort to the three-factor test of *Mathews v. Eldridge, supra,* 424 U.S. 319. *Morrissey* has already established that an incarcerated parolee is entitled to a prerevocation preliminary hearing. DeLeon was deprived of that hearing.

The Court of Appeal expressed concern over "further burden[ing] our overworked and under-resourced superior courts" by requiring both a preliminary hearing and a final revocation hearing. This legitimate institutional concern, however, cannot justify depriving a parolee of his right to due process of law. Additionally, there are several practical solutions to address this increased burden on judicial resources. First, the preliminary hearing provides a valuable screening tool that will result in some early dismissals, thereby lessening the number of final revocation hearings the court will be required to perform. Second, *Morrissey* does not require that a judge conduct the preliminary hearing. (*Morrissey*, *supra*, 408 U.S. at p. 486.) Section 1203.2, subdivision (f) provides that the revocation

proceedings may take place before a "judge, magistrate, or revocation hearing officer described in Section 71622.5 of the Government Code." That section authorizes the superior court to "appoint as many hearing officers as deemed necessary to conduct parole revocation hearings pursuant to Sections 3000.08 and 3000.09 . . . ." (Gov. Code, § 71622.5, subd. (b).) Third, section 3000.08 contemplates review by the parole agency before the case is submitted to the superior court for revocation. (§ 3000.08, subds. (d), (f).) This review may satisfy *Morrissey*'s preliminary hearing requirement if it includes a probable cause determination, conducted reasonably near the place of the alleged parole violation or arrest, by someone not directly involved in the case, with notice to the parolee and an opportunity to appear and defend. (*Morrissey*, at pp. 485–487.)

Both parties ask us to address additional questions not directly implicated by the facts of this case in order to provide broader guidance. The Attorney General urges us to approve a unitary hearing procedure for parole revocations conducted under section 1203.2 (see *Coleman*, *supra*, 13 Cal.3d at pp. 894–895), even as he concedes that the final revocation hearing, conducted 41 days after DeLeon's arrest, could not be considered a timely unitary hearing. (See *Williams*, *supra*, 230 Cal.App.4th at p. 655 ["*Coleman*'s approval of a single revocation hearing is conditional; it presumes the hearing will be held relatively soon after the person is arrested, and that the person will be afforded procedural benefits at all stages of the revocation process"].) We decline the Attorney General's invitation. The due process question is necessarily informed by the particular procedures employed by the court. (*Morrissey*, *supra*, 408 U.S. at p. 481.) It is therefore best to resolve the constitutionality of a unitary hearing in the context of a proceeding that purports to satisfy the minimum requirements for such a hearing.

DeLeon urges us to hold that due process requires that the preliminary hearing take place within 15 days of arrest. We decline this invitation as well.

22

When faced with systemic constitutional violations, some courts have found it necessary to impose a mandatory time limit for conducting a *Morrissey* preliminary hearing. In *Williams*, *supra*, 230 Cal.App.4th 636, the court found it "manifest that the due process rights of parolees are being systematically violated in Orange County" (*id*. at p. 654), based on a 2013 survey indicating that parolees averaged more than 16 days in custody before their first court appearance (*id*. at p. 646). The *Williams* court adopted a rule requiring "arraignment within 10 days of an arrest for a parole violation, a probable cause hearing within 15 days of the arrest, and a final hearing within 45 days of the arrest." (*Id*. at p. 643.) Similarly, a class action lawsuit filed against the Department of Corrections and Rehabilitation in federal district court in 1994 established that parolees were denied a preliminary revocation hearing, and were detained an average of 35 days before receiving a final revocation hearing. (*Valdivia v. Davis*, *supra*, 206 F.Supp.2d at p. 1071 & fn. 7.) The district court adopted a remedial plan requiring, among other things, that parolees receive a probable cause hearing within 10 business days after service of a notice of charges and rights. (*Valdivia v. Brown*, *supra*, 956 F.Supp.2d at pp. 1127–1128.) The lawsuit was later dismissed as moot due to the passage of the Realignment Act. (*Valdivia v. Brown*, at pp. 1135–1140.)

There is no evidence in this record of the timelines for conducting preliminary hearings in Solano County, or of systemic violations of parolees' constitutional rights. DeLeon points to a remark by defense counsel on the date set for the preliminary hearing that the prosecutor "is well aware of this issue. I made the same objection last week. And it is an ongoing problem, and it is an easy fix." After the trial court ordered briefing, however, defense counsel offered no argument or evidence that the *Morrissey* procedures had been systematically violated. Nor did the trial court make a finding in this regard. We agree with the

23

federal district court's observation in *Valdivia* that "[w]hether the new system provides adequate due process must be demonstrated in practice, without untoward judicial interference until the need for intervention is clear." (*Valdivia v. Brown*, *supra*, 956 F.Supp.2d at pp. 1136–1137.) Accordingly, we decline to resolve whether an outer time limit is constitutionally compelled. Instead, we reiterate *Morrissey*'s command that the preliminary hearing should occur "as promptly as convenient after arrest." (*Morrissey*, *supra*, 408 U.S. at p. 485.)

### E. *Prejudice*

"The denial of [a parolee's] right to a timely prerevocation hearing notwithstanding his timely effort to assert it does not necessarily mean that he is automatically entitled to relief therefrom." (*La Croix*, *supra*, 12 Cal.3d at p. 154.) Someone "whose parole has been revoked after a properly conducted revocation hearing is not entitled to have the revocation set aside unless it appears that the failure to accord him a prerevocation hearing resulted in prejudice to him at the [final] revocation hearing." (*Ibid.*) The test of prejudice is whether the denial of the constitutionally mandated hearing was harmless beyond a reasonable doubt. (*Ibid.*, citing *Chapman v. California* (1967) 386 U.S. 18, 24.) Additionally, the reviewing court may restore a parolee to parole status even absent a showing of prejudice as a "severe sanction" based on "a showing that the Authority is unresponsive to [the] mandates of *Morrissey* and its progeny and must be coerced to comply therewith." (*La Croix*, at p. 155.)

As explained, this record does not support DeLeon's assertion that *Morrissey* has been systematically violated. Nor are we called upon to evaluate whether case-specific prejudice occurred because subsequent events have mooted DeLeon's claim for relief.

24

## III. DISPOSITION

We conclude that incarcerated parolees facing revocation under section 1203.2 are entitled to a timely preliminary hearing.  DeLeon was denied such a hearing, but he has completed his period of incarceration, and his parole supervision has terminated.  Because these events occurred during the pendency of his appeal, we reverse the judgment of the Court of Appeal and remand with directions to dismiss the appeal as moot.[13]

CORRIGAN, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
CHIN, J.
LIU, J.
CUÉLLAR, J.
KRUGER, J.

---

[13]    See *People v. Cheek* (2001) 25 Cal.4th 894, 897–898, 903; *People v. Gregerson* (2011) 202 Cal.App.4th 306, 310, 321–322; *Fallbrook Sanitary Dist. v. San Diego Local Agency Formation Com.* (1989) 208 Cal.App.3d 753, 757–758, 765.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. DeLeon

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 241 Cal.App.4th 1059
**Rehearing Granted**

_____

**Opinion No.** S230906
**Date Filed:** July 24, 2017

_____

**Court:** Superior
**County:** Solano
**Judge:** Robert S. Bowers

_____

**Counsel:**

Roberta Simon, under appointment by the Supreme Court, for Defendant and Appellant.

Sharon Petrosino, Public Defender (Orange), Daniel J. Cook, Chief Deputy Public Defender, and David Dworakowski, Assistant Public Defender, for Orange County Public Defender as Amicus Curiae on behalf of Defendant and Appellant.

Jeff Adachi, Public Defender (San Francisco), Matt Gonzalez, Chief Attorney, and Dorothy Bischoff, Deputy Public Defender, for San Francisco Public Defender's Office as Amicus Curiae on behalf of Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Allen R. Crown, Allan Yannow, Stephen G. Herndon, Rachelle A. Newcomb and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

Jackie Lacey, District Attorney (Los Angeles), Steven Katz, Head Deputy District Attorney, Phyllis C. Asayama and Ruth M. Low, Deputy District Attorneys, for Los Angeles County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Roberta Simon
Post Office Box 10728
Oakland, CA 94610
(510) 763-7226

Darren K. Indermill
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 94244-2550
(916) 324-5244